106 So.2d 316 (1958)
235 La. 937
ESSO STANDARD OIL COMPANY
v.
CRESCENT RIVER PORT PILOTS ASSOCIATION et al. and New Orleans and Baton Rouge Steamship Pilots Association et al.
No. 43741.
Supreme Court of Louisiana.
April 21, 1958.
On Rehearing November 10, 1958.
*318 Cobb & Wright, Joseph V. Ferguson, II, Herman M. Baginsky, Lemle & Kelleher, Selim B. Lemle, New Orleans, for defendants-appellants.
A. M. Curtis, Baton Rouge, Henry B. Curtis, Eugene E. Huppenbauer, Jr., John C. Foster, Curtis, Foster & Dillon, New Orleans, for plaintiff-appellee.
Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, Joseph M. Rault, Wm. E. Wright, New Orleans, Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, for intervenors-appellees.
*319 PONDER, Justice.
The plaintiff is asking for a declaratory judgment to settle a jurisdictional dispute between the defendants, Crescent River Port Pilots Association and New Orleans and Baton Rouge Pilots Association.
This dispute arose when the New Orleans and Baton Rouge Pilots Association, hereinafter referred to as the Baton Rouge Pilots, refused to pilot vessels between Southport and Quarantine Anchorage, also known as General Anchorage and Merauxville.
The Baton Rouge Pilots contend that their jurisdiction ends at Southport under the provisions of Act 291 of 1942, LSA-R.S. 34:1043, and that this Act imposes no obligation on them to pilot vessels beyond this point. It is stated in the title that this is "An ActTo regulate the system of river port pilotage between the ports of New Orleans and Baton Rouge and any intermediate ports * * *." Section 2 in the body of the act provides: "That there shall be a body of pilots to be known as `New Orleans and Baton Rouge Steamship Pilots' whose duty it shall be to pilot sea-going vessels from the port of New Orleans to and including the port of Baton Rouge and intermediate ports and return." This act was amended by Act 146 of 1956 but no change was made as to the jurisdiction set out in Section 2 of Act 291 of 1942.
On the other hand, the Crescent River Port Pilots Association, hereinafter referred to as the New Orleans Pilots, contend that although they have exclusive jurisdiction within the port of New Orleans under the provisions of Act 54 of 1908, as amended, LSA-R.S. 34:991 et seq., that nevertheless it is the duty of the Baton Rouge Pilots to take southbound ships to Quarantine Anchorage and northbound ships from Quarantine Anchorage to points beyond Southport.
The plaintiff asked for a mandatory injunction against all of the defendants and was joined in this request by a number of intervenors who were engaged in shipping on the Mississippi River.
Upon hearing, the trial judge granted an injunction in favor of the plaintiff and intervenors ordering the defendants to continue the exchange of pilots at General Anchorage and any point of general anchorage in the Harbor of New Orleans in accordance with a custom that had been followed by the two groups of pilots. The defendant, Baton Rouge Pilots, has appealed.
The New Orleans Pilots were created by Act 54 of 1908, which is entitled: "An ActTo regulate the system of river port pilotage between the ports of New Orleans * * *." It is provided in Section 2 in the body of this act "That there shall be a body of pilots known as `River Port Pilots' whose duty it shall be to pilot seagoing vessels from the head of the Passes opposite Pilot Town, to the port of New Orleans and return." This act was amended a number of times. By Act 134 of 1942 the title was changed so as to provide: "An Act regulating the system of river port pilotage on the Mississippi River between Pilottown and Southport and within the Port of New Orleans * * *." Section 2 was amended so as to provide: "That there shall be a body of pilots known as `River Port Pilots' whose duty it shall be to pilot seagoing vessels from Pilottown to Southport and return and within the Port of New Orleans." Section 3 of this act provides: "* * * That said river port pilots shall be entitled to the exclusive right to pilot vessels within the Port of New Orleans between Southport and Merauxville, Louisiana * * * provided, however, nothing herein contained shall prevent an exchange of pilots at what is known as `Algiers Point,' between the pilots herein named and the pilots engaged in the piloting of vessels beyond Southport, nor shall anything herein provided prevent pilots engaged in piloting vessels above Southport from ending or beginning *320 the pilotage from any wharf or point of anchorage in the harbor of New Orleans."
Act 134 of 1942 was amended by Act 219 of 1950 and the title was changed to: "An ActTo regulate the system of river port pilotage on the Mississippi River between Pilottown, Louisiana, and New Orleans, Louisiana, and within the Port of New Orleans * * *." Section 2 was amended so as to read: "There shall be a body of pilots known as the `River Port Pilots', whose duty it shall be to pilot vessels between Pilottown and New Orleans, * * *." Section 6 was amended to read: "The said River Port Pilots shall have the exclusive right to pilot vessels between New Orleans, Louisiana, and Pilottown, Louisiana, and within the Port of New Orleans between Southport and Mereauxville * * * provided, however, that nothing herein contained shall prevent an exchange of pilots at what is known as `Algiers Point', between the pilots herein named and the pilots engaged in the piloting of vessels above Southport, nor shall anything herein provided prevent pilots engaged in piloting vessels above Southport from ending or beginning the pilotage from any wharf or point of anchorage in the Harbor of New Orleans."
This act was again amended by Act 177 of 1952 which made no change in Section 2 in regard to jurisdiction but amended Section 6 so as to substitute "Quarantine Anchorage" for "Algiers Point".
From a reading of these acts and all of the amendments thereto, it is the duty of the New Orleans Pilots to pilot vessels from Pilottown to New Orleans. They are given the exclusive right to pilot vessels between New Orleans and Pilottown and within the port of New Orleans between Southport and Mereauxville (or Quarantine Anchorage), provided nothing shall prevent an exchange of pilots at Quarantine Anchorage, or from any wharf or the "point" of "general anchorage" in the Harbor of New Orleans.
The statute creating the Baton Rouge Pilots imposes the duty "to pilot sea-going vessels from the port of New Orleans to and including the port of Baton Rouge and intermediate ports and return." Act 291 of 1942. This provision of the statute has never been changed. It is contended by the Baton Rouge Pilots that the word "from" New Orleans is exclusive because the words "to and including" Baton Rouge were used; if the legislature had intended to include the Port of New Orleans it would have provided specifically that the Port of New Orleans was included.
From our investigation of the many authorities cited interpreting the words "to" and "from", it seems that they may be used inclusively or exclusively owing to the text of the instrument wherein they are used. See Volume 41, Words and Phrases, Verbo To, pages 694, 695 and 696. But be that as it may, the legislature did not impose a duty on the Baton Rouge Pilots to exchange pilots at the extreme south end of the port of New Orleans, especially is this borne out by the fact that the exclusive right to pilot vessels within the port of New Orleans between Southport and Quarantine Anchorage is given to the New Orleans Pilots.
During the session of the legislature in 1942, the Baton Rouge Pilots were created and their duties defined. See Act 291 of 1942. At that same session of the legislature, Act 134 of 1942 was enacted wherein the New Orleans Pilots were required to pilot vessels between Pilottown and Southport. The permissive clause permitting the exchange of pilots at Algiers Point, the south end of the Port of New Orleans, was contained therein. While the jurisdiction of the New Orleans Pilots have been subsequently changed, there has been no change in the jurisdiction of the Baton Rouge Pilots. This indicates that the legislature intended that jurisdiction of the Baton Rouge Pilots ended at Southport, the north end of the Port of New Orleans, and the permissive clause regarding exchange *321 of pilots imposed no obligation on the Baton Rouge Pilots.
A great deal of stress is laid on the fact that in the act creating the New Orleans Pilots, as amended, it is provided that nothing therein contained shall prevent an exchange of pilots at Quarantine Anchorage, or at a point of general anchorage within the Harbor of New Orleans. The argument is advanced that this imposes a duty upon the Baton Rouge Pilots to continue a custom that had existed before the Baton Rouge Pilots had been created and was followed thereafter.
To this the simple answer is that this is a jurisdictional dispute and this Court is without authority to fix jurisdiction based on custom. It is our duty to interpret the legislative will and not to supplement it or to supply it. Levy v. New Orleans & North Eastern R. Co., La.App., 20 So.2d 559.
The proviso in Section 6 of Act 177 of 1952 (as found in the previous acts) that "nothing herein contained shall prevent an exchange of pilots at what is known as `Quarantine Anchorage' or `the point of general anchorage' between the pilots herein named and the pilots engaged in the piloting of vessels above Southport, nor shall anything herein provided prevent pilots engaged in piloting vessels above Southport from ending or beginning the pilotage from any wharf or the `point' or `general anchorage' in the Harbor of New Orleans" is not contained in the act governing the Baton Rouge Pilots (Act 134 of 1942) and in our opinion it is nothing more than a permit granted to the two pilot groups to enter into such an agreement by contract. It does not say that they "shall" make an exchange at those points but merely provides that they are not prevented from doing so when they see fit.
It would seem to us that the provision of the statute making it the duty of the New Orleans Pilots to pilot vessels between Pilottown and New Orleans and return is no more inclusive or exclusive than the provisions in the Baton Rouge Pilots act which provides for pilotage from New Orleans north and return. In either instance what point did the legislature intend for their jurisdiction to end? The Port of New Orleans is 13 miles long and this Court cannot designate under these statutes at what point the exchange of pilots should be made. To do so would be usurping a legislative function.
Since the intention of the legislature in fixing the duty of these two groups of pilots does not impose upon either of them the duty to exchange pilots at any given point, we are not warranted in giving a declaratory judgment and this Court is powerless to settle this dispute. We cannot legislate.
For the reasons assigned, the judgment of the lower court is overruled. The injunction issued herein is recalled and set aside. All costs are to be paid by plaintiff, appellee, and intervenors.
HAWTHORNE, J., dissents.
McCALEB, J., dissents with written reasons.
McCALEB, Justice (dissenting).
The district judge has written a comprehensive opinion in this case, with which I fully agree. To me, the majority are begging the question in concluding in substance that, because the Legislature did not clearly fix the jurisdiction of the Baton Rouge pilots within the port of New Orleans while piloting vessels from the port of New Orleans to Baton Rouge and return, it would be legislating for this Court to declare that it was the intent of the Legislature to delineate such jurisdiction.
In the first place, I think it plain that, when the Legislature passed Act 291 of 1942 stating in its title that it was an Act "To regulate the system of river port pilotage *322 between the ports of New Orleans and Baton Rouge and any intermediate ports", it intended to fix jurisdiction. And when it created "a body of pilots to be known as `New Orleans and Baton Rouge Steamship Pilots' whose duty it shall be to pilot sea-going vessels from the port of New Orleans to and including the port of Baton Rouge and intermediate ports and return", it is perfectly evident that it was attempting to fix the area in which the New Orleans and Baton Rouge pilots were required to function. Surely, if the Legislature had intended only that these pilots were required to exchange vessels at Southport, which is located at the upper end of the port of New Orleans, it would have been easy to say so. And, when the Act stated "from the port of New Orleans" without limitation, it can only signify a duty to exchange vessels from the point of general anchorage within the harbor of New Orleans where these vessels have been customarily exchanged for over a long period of years.
Nor can I agree with the statement of the majority that "* * * this Court is without authority to fix jurisdiction based on custom" for, presented here for decision, is simply an interpretation of what the Legislature meant when it made it the duty of the Baton Rouge Pilots to pilot sea-going vessels from the port of New Orleans to and including the port of Baton Rouge. To ascertain this design, the 50-year custom of exchange of pilots at quarantine anchorage is most pertinent and I know of no reason in law why it cannot be considered. Indeed, while it is the accepted rule that usage or custom cannot nullify the plain meaning of a statute, "* * * in enacting legislation, the legislature has been presumed to have in mind immemorial customs of the people, and a usage or custom is often regarded by the courts as an indication of the construction to be given to a statute of doubtful meaning". See 50 Am.Jur. "Statutes", Section 297, page 278.
To say that the Legislature did not provide or even intend to provide for an exchange of pilots within the port of New Orleans, a matter so vital to the commerce, industry and, forsooth, the general welfare of this State, is to charge it with the grossest sort of negligence and ineptitude.
I respectfully dissent.

On Rehearing
HAWTHORNE, Justice.
We granted a rehearing in this case in order to give further thought to the respective duties and jurisdictions of these two groups of pilots. After much deliberation we have decided that the district judge who heard this case arrived at the correct solution of the problem, and we are so impressed by the reasons which he gave for his judgment that we have decided to adopt them as our own.
"This is a suit for declaratory judgment," he wrote, "and injunctive relief brought by Esso Standard Oil Company against Crescent River Port Pilots Association and New Orleans and Baton Rouge Steamship Pilots Association, and the individual members comprising each association. The New Orleans Steamship Association and various shipping companies operating on the Mississippi River, Kaiser Aluminum and Chemical Corporation, Cargill, Incorporated, Greater Baton Rouge Port Commission and Board of Commissioners of the Port of New Orleans filed interventions in this proceeding, some of whom have also prayed for injunctive relief. Temporary restraining orders were issued in favor of plaintiff and several of the intervenors, and on May 31, 1957, judgment was rendered dismissing the rule brought by New Orleans and Baton Rouge Steamship Pilots Association to dissolve the temporary restraining orders and further ordering the issuance of a preliminary writ of injunction against all defendants as prayed for.
*323 "The sole issue of this case is a controversy between the two defendant Mississippi River Pilot Groups as to which of these two pilot groups must furnish pilotage services to seagoing vessels bound for and returning from points above New Orleans when such vessels are operated over the 13-mile stretch of the Mississippi River lying between the Point of general anchorage in the lower limits of the Port of New Orleans and Southport in the upper limits of the port of New Orleans.
"Plaintiff, Esso Standard Oil Company, owns and operates a large refinery in East Baton Rouge Parish, State of Louisiana, and also operates a large fleet of tankers for the transportation of crude oil and petroleum products. Plaintiff operates some 25 or 30 tankers a month on the Mississippi River and has for many years depended upon the pilotage services furnished by each of the defendant pilot groups in the operation of its vessels between Baton Rouge and Pilottown. Most of the intervenors also operate vessels on the Mississippi River and depend upon the pilotage services furnished by each of the defendant pilot groups to and from Pilottown and the Port of New Orleans and Port of Baton Rouge. Other defendants have a serious interest in the uninterrupted pilotage services from Pilottown through the Port of New Orleans to Baton Rouge.
"From the evidence adduced at the trial, it is undisputed that a custom and practice has existed for nearly half a century whereby the Crescent River Port Pilots Association, also called River Port Pilots, and either the New Orleans and Baton Rouge Steamship Pilots Association, or the independent pilot group which preceded the creation of this association, exchanged pilots in the vicinity of what is now known as `Quarantine Anchorage' or the `point of general anchorage', formerly called Goodyear Landing or Algiers Point, in the lower limits of the Port of New Orleans. It is also the custom and practice of the New Orleans and Baton Rouge Steamship Pilots Association, or its predecessor group, to begin pilotage services at wharves in the Port of New Orleans with respect to vessels bound upstream from New Orleans and to deliver vessels bound to New Orleans from points above New Orleans at wharves in the Port of New Orleans. It is also the exclusive job of the Crescent River Port Pilots Association to perform all of the shifting of vessels within the Port of New Orleans. The evidence produced at the trial clearly shows that the Port of New Orleans has only one established general anchorage, which is located in the lower limits of the Port of New Orleans. This anchorage, which is commonly referred to as `point of general anchorage', and `Quarantine Anchorage', which lies just above it, were established by the United States Engineers pursuant to authority of Act of Congress. Further, it has been shown that from the standpoint of safety and the proper handling of a vessel, it is advisable that the exchange of pilots be effected in the vicinity of an anchorage so that in case of delay in the arrival of the relief pilot the vessel may safely anchor.
"On May 6, 1957, the New Orleans and Baton Rouge Steamship Pilots Association notified Esso Standard Oil Company that after midnight, May 15, 1957, it would no longer accept vessels intended for pilotage below Southport. On May 9, 1957, the Crescent River Port Pilots Association advised Esso Standard Oil Company it would not make the exchange of pilots at any place other than the point of general anchorage. The threats of the two pilot groups compelled plaintiff to seek the injunctive relief herein prayed for.
"The evidence presented shows that in the event of the discontinuance of the practices hereinabove referred to, there would result an interruption or delay in the navigation of the tanker fleet of Esso Standard Oil Company, which would cost plaintiff in excess of Three Thousand Dollars for each day of interruption or delay. Plaintiff would also suffer irreparable *324 loss in the efficient operation of its refinery at Baton Rouge, Louisiana. As to those various intervenors who have intervened herein jointly with the New Orleans Steamship Association, the discontinuance of said practices would leave said intervenors without pilot service in the 13-mile stretch within the Port of New Orleans. They would further sustain disruption of their business, interference with their operations, delays to ships owned, operated or represented by them, including, on account of said delays, disruption of established sailing schedules, interference with their bills of lading, bookings, and/or other contract relations with shippers and/or consignees of cargo, and many other irreparable losses all in substantial but incalculable amounts far in excess of Five Thousand Dollars. All other intervenors have shown that the discontinuance of the practices hereinabove referred to would also result in irreparable injury to them in very substantial and incalculable amounts.
"Each of the defendant pilot groups were created by Acts of the Legislature, the Crescent River Port Pilots Association being created by Act 54 of 1908 and the New Orleans and Baton Rouge Steamship Pilots Association being created by Act 291 of 1942. The present statutory provisions applicable to each of the pilot groups are L.R. S. 34:991-1003 and L.R.S. 34:1041-1050.
"The latest Act relating to the River Port Pilots is Act 177 of the Louisiana Legislature of 1952 (L.R.S. 34:991-1003). This statute, in Section 2, defines the duties of these pilots as extending `between Pilottown and New Orleans'. Section 6 confers on these pilots `the exclusive right' to pilot vessels between New Orleans and Pilottown and within the Port of New Orleans between Southport and Mereauville, and other locations not pertinent herein. This same section, however, after granting such `right', specifically provides that `nothing herein contained shall prevent an exchange of pilots at what is known as "Quarantine Anchorage" or "the point of general anchorage" between the pilots herein named and the pilots engaged in the piloting of vessels above Southport, nor shall anything herein provided prevent pilots engaged in piloting vessels above Southport from ending or beginning the pilotage from any wharf of the "point" or "general anchorage" in the Harbor of New Orleans'. Except for slight variations in phraseology not altering the substance, this language is identical with the language contained in Act 134 of 1942 which was passed by the same Legislature that originally created the New Orleans and Baton Rouge Pilots in the year 1942.
"The latest Act relating to the New Orleans and Baton Rouge Pilots is Act 146 of the Louisiana Legislature of 1956 (L.R. S. 34:1041-1050). Section 2 of that statute defines the duties of these pilots to extend `from the Port of New Orleans to and including the Port of Baton Rouge and intermediate ports and return'. This language is identical with the language used by the Legislature in Section 2 of the Act which originally created these pilots, Act 291 of 1942.
"In view of the above, one of the questions for decision is whether the word `from' in the phrase `from the Port of New Orleans to and including the Port of Baton Rouge', in the New Orleans and Baton Rouge Pilots' statute, is a word of inclusion or exclusion.
"Generally such words as `from' and `to' as applied to distances from one place to another, are used in an inclusive rather than an exclusive sense. Union Pacific R. R. Co. v. Hall, 91 U.S. 343, 23 L.Ed. 428 (1876); Chesapeake and O. Canal Co. v. Key, 5 Fed.Cas. p. 563 [No. 2,649] (1829); People v. Klammer, 137 Mich. 399, 100 N.W. 600 (Mich.1904); Devon v. Cincinnati, C. & E. Ry. Co., 128 Ky. 768, 109 S.W. 361 (C.A.Ky.1908). However, such words may be either inclusive or exclusive depending upon the intent of the parties, the circumstances of the particular case and the subject matter involved. 37 C.J.S., p. 1384.
*325 "In determining whether the words `from' and `to' were used by the Legislature to include or to exclude the Port Of New Orleans, the two acts must be construed together, for in Louisiana all laws in pari materia must be construed with reference to each other. Rev.Civ. Code, Art. 17.
"Aside from the fact that `from' and `to' vary in meaning depending upon the factors mentioned above, it seems quite apparent that the two statutes are somewhat ambiguous, to say the least, as neither act imposes a duty on either group of pilots to exchange pilots at any particular location with reference to the Port of New Orleans, while the defendants, and the other litigants herein, all agree that the Legislature intended to provide, and did provide, for uninterrupted pilot service from the Gulf to Baton Rouge. The statutes being ambiguous, an attempt must be made to resolve the ambiguity and reconcile them in light of the evidence presented at the trial outlining the history of the Pilots, the customs which have existed between them in the past, the representations they made to the Legislature from time to time, and the causes that induced the Legislature to enact them, as these are factors to be considered in determining legislative intent. Rev.Civ.Code, Art. 18.
"Prior to 1908, and for some indefinite time before then, it was the established custom of pilots bringing ships from the mouth of the Mississippi River to New Orleans to exchange pilots at `General Anchorage' (a term used to describe an anchorage ground below Algiers Point near Goodyear Landing in the river near the lower limits of the port of New Orleans), with a group of pilots who then took vessels from that location up-river to points above New Orleans. For a long time it was also the custom of the lower river pilots to do all of the shifting of vessels in the Port of New Orleans, but when ships were bound up-river to points above New Orleans, or down-river to points in New Orleans, the upper river pilots accepted the up-bound vessels in the port and brought the down-bound vessels to destinations within the port.
"In 1908, Act 54 of the Louisiana Legislature created a system of River Port Pilots, defining their territorial jurisdiction as extending `from the head of the passes opposite Pilot Town to the Port of New Orleans and return'. The River Port Pilots, as well as the pilots handling vessels above New Orleans, never construed the words `to' and `from', as used in this act, as prohibiting them from piloting vessels above the lower limits of the Port of New Orleans. In fact, the evidence establishes that they from the very beginning construed these words as including all points within the Port of New Orleans, and under the authority of the Act they undertook to pilot vessels to and from wharves located within the Harbor of New Orleans. That this was the true meaning of the Act was further made clear by an amendment passed in 1914, being Act 148, which allowed these pilots a fee for every vessel `entering or leaving the Port of New Orleans.'[1]
"The original Act of 1908 was again amended by Act 9 of 1918, but the phraseology of the previous acts, as to territorial jurisdiction, remained the same, and from that date until 1942 the law remained unaltered and the customs as set forth above continued without variation or interruption.
"In 1940 the then private or voluntary New Orleans and Baton Rouge Pilots introduced a bill in the 1940 Legislature seeking to become statutory compulsory pilots (Exhibit P-7). This bill, which was later vetoed by the Governor, would have obligated these pilots to pilot vessels `from New Orleans to and including Baton Rouge', but it also permitted them to shift vessels in `any harbor or port.' The River Port Pilots were opposed to permitting the *326 New Orleans and Baton Rouge Pilots to shift vessels in the Harbor of New Orleans, as that right as stated above, had for many years been performed only by the River Port Pilots. As a result, discussions were held between the two pilot groups and their attorneys while this legislation was pending, as a result of which the Manager of the New Orleans and Baton Rouge Pilots, Captain O. D. Jackson, wrote a letter to the President of the River Port Pilots (Exhibit P-6), agreeing to change the bill pending in the Legislature by adding that the New Orleans and Baton Rouge Pilots would have the right to shift vessels in any harbor `except within the limits of the Port of New Orleans. Said New Orleans and Baton Rouge Steamship Pilots shall not be entitled to shift vessels from dock to dock, wharf to wharf, or point to point, within the harbor of the Port of New Orleans.' This letter also recited that the practice of exchanging pilots at General Anchorage, as well as `all other arrangements between our bodies' shall remain exactly the same as they existed at that time and had existed in the past.
"The above bill and letter clearly show:
"1. That the original bill introduced in 1940 by the New Orleans and Baton Rouge Pilots themselves authorized them to pilot vessels within the harbor of New Orleans not only as to upbound vessels but even for the purpose of shifting vessels from wharf to wharf, etc., within the harbor;
"2. That the New Orleans and Baton Rouge Pilots agreed to change the act as originally drafted for one purpose only, that is, to exclude them from having shifting rights solely within the New Orleans harbor; and
"3. That they themselves, the New Orleans and Baton Rouge Pilots, confirmed in writing that the practice of exchanging pilots at `general anchorage' (Goodyear Landing) would continue as in the past, as well as all other practices between the two associations.
"Although the above bill was, as previously stated, vetoed by the Governor, in 1942 a bill was passed and approved and became Act 291 of that year, setting up the New Orleans and Baton Rouge Pilots as statutory compulsory pilots. This Act defined the territorial jurisdiction of these pilots in identical language with the language appearing in the latest and current act, 146 of 1956 (L.R.S. 34:1041-1050), that is, it defined their jurisdiction as extending `from the Port of New Orleans to and including the Port of Baton Rouge and intermediate ports and return * * *' It also contained the language of Captain Jackson's letter of 1940 prohibiting these pilots from shifting vessels within the Port of New Orleans. This Act therefore preserved and affirmed that the pilots would continue all other piloting in the port as established by custom, because the expressed exclusion of one form of piloting shiftingmakes clear that no other exclusion was intended. State ex rel. Fitzpatrick v. Grace, 187 La. 1028 (1936), 175 So. 656; Wabash [R. Co.] v. United States, 178 Fed. 5 (C.C.A.8).
"In the same session of the Legislature, Act 134 of 1942 was passed relating to the River Port Pilots. Section 3 of that statute preserved the custom of these pilots shifting vessels within the Port of New Orleans between Southport and Mereauville, but contained the proviso, which is likewise in the current statute (Act 177 of 1952; L.R.S. 34:991-1003) to the effect that nothing therein contained shall prevent an exchange of pilots at `Algiers Point' (General Anchorage) between the two Pilot Associations, nor shall anything therein contained prevent the New Orleans and Baton Rouge Pilots from `ending or beginning the pilotage from any wharf or point of anchorage' in the Harbor of New Orleans.
"It is clear from the above that the Legislature and the pilots of both associations in 1940, when the Legislature passed *327 but the Governor vetoed the 1940 bill, and again in 1942 when the two statutes were passed, intended to preserve, and did preserve, all of the customs and practices as they existed at that time and that the word `from' New Orleans in the New Orleans and Baton Rouge Pilots' Act was used as inclusive of the Port of New Orleans.
"It is significant to note that the New Orleans and Baton Rouge Pilots are the same pilots who appeared before the 1956 Legislature and submitted to the members of Judiciary `B' of the House Committee then considering the bill, which became Act 146 of 1956, and which was nothing more than a bill to raise their fees, a three sheet statement in which they stated:
"`Facts And Figures Concerning The Working Conditions Of A New Orleans-Baton Rouge SS Pilot'. In this same statement they went on to recite: `The Crescent River Port Pilots; their route is from Pilottown to and including the harbor of New Orleans. A distance of approximately 94 miles. We, the Baton Rouge Pilots, known as the Baton Rouge Steamship Pilots, whose route is from New Orleans to Baton Rouge, a distance of 141 miles.' (Italics added.)
"As the evidence herein established conclusively, the distance from Pilottown to `General Anchorage' is approximately 94 miles and the distance from `General Anchorage' to the Esso Dock in Baton Rouge is approximately 141 miles. As the distance from Southport to the Port of Baton Rouge is 13 miles less, or about 127 or 128 miles, it is perfectly plain that the New Orleans and Baton Rouge Pilots, in seeking a fee increase in 1956, did not suggest that there should be any change in the historic custom of exchanging pilots at `General Anchorage' and affirmed to the Legislature that they are obligated to pilot ships to and from `General Anchorage'. This conclusively shows that the 1956 Legislature, as the Legislatures in previous years, preserved the customs and practices as they had existed in the past.
"Furthermore, if the Court thought that the legislative intent herein was doubtful, a thought which the Court does not entertain in view of the history of the statute as outlined above, such doubt would be more than amply removed by the contemporaneous construction the pilots themselves placed upon the statutes, coupled with the fact that the customs at issue have existed for so long a time without variation. Contemporaneous construction must be given substantial weight and in the case of doubt is decisive in construing statutes. Brown v. United States, 113 U. S. 568 [5 S.Ct. 648], 28 L.Ed. 1079 (1885); United States v. Alabama Great Southern Railroad Co., 142 U.S. 615 [12 S.Ct. 306], 35 L.Ed. 1134 (1892); Henderson v. Henderson, 109 F.2d 863 (C.C.A. 9 1940). In addition, custom which has existed over a long period of time takes on the force of law. Rev.Civ.Code, Art. 3; Broussard v. Bernard, 7 La. 211 (1834); Etna Forge & Bolt v. Youngstown Sheet and Tube Co., 282 Fed. 786 (C.C.A. 3 1922). And custom is particularly controlling in matters involving navigable streams. Managua [Nav. Co. v. Aktieselskabet Borgestad], 7 F.2d 990 (C.C.A. 5 1925); Mississippi Valley Barge Line Company v. Esso Shipping Company, 240 F.2d 606 (C.C.A. 5 1957). Certainly, the abrogation of such long standing practices existing for almost a half century would require clear and unequivocal language revealing that such was the true legislative intent, and in the instant case it is not even urged that any such clear expression is contained in any of the statutes involved.
"Despite all this, however, it is urged that the words `to and including the Port of Baton Rouge' show that the Legislature used the words `from' as wholly excluding the Port of New Orleans; otherwise, it is argued, the words `including *328 the Port of Baton Rouge' would not have been used. In light of the Act as a whole, no such inference can be drawn, as the words `including Baton Rouge' were obviously used to make it clear that the upper river pilots would have the same exclusive shifting privileges in the Baton Rouge Harbor as the lower river pilots possessed in the Port of New Orleans. The words `to Baton Rouge' standing alone might well have been interpreted by some as meaning only to well established wharves and anchorages in the Harbor of Baton Rouge, rather than throughout the whole Baton Rouge Harbor, and in 1942 it was quite natural for these pilots to have it made absolutely plain, at the outset, that they were to pilot vessels throughout the whole Harbor of Baton Rouge. Under the circumstances, the words `including Baton Rouge' were actually superfluous, as the words `to Baton Rouge' standing alone would have entitled these pilots to go to all established locations in the harbor of Baton Rouge, just as the words `to New Orleans' in all previous acts had permitted the River Port Pilots to pilot ships throughout the Port of New Orleans.
"Initially, from the pleadings it appeared to the Court that the New Orleans and Baton Rouge Pilots were contending that the law does not permit them to pilot ships within the Port of New Orleans for any purpose whatsoever. However, at the trial these pilots, altering their defense, took the position that the exchange of pilots between themselves and the River Port Pilots should take place at a position 1-½ miles below Southport, well within the limits of the Port of New Orleans. This undoubtedly developed for two reasons: First, because it is impossible to exchange pilots at the upper limits of the Port of New Orleans at or near Southport for at that location there is a sharp bend in the river, and secondly because there is no recognized anchorage at or near Southport. In fact, as Mr. Dodd of the United States Engineers testified the only established anchorages in the vicinity of the Port of New Orleans are at `General Anchorage'. The necessity for exchanging pilots in the vicinity of a general anchorage is to permit anchorage of a vessel in the event the pilots should miss connections, which from the testimony adduced at the trial, happens on occasions. As Mr. Dodd testified, the anchoring of a vessel under these circumstances away from an established anchorage is prohibited by federal law, a fact which the Legislature undoubtedly considered in preserving the exchange of pilots at `general anchorage'.
"The Court is, therefore, of the opinion that the defendants, New Orleans and Baton Rouge Steamship Pilots Association, and the individual members thereof, have the legal obligation and duty to accept and undertake the pilotage of vessels bound upstream for ports above the Port of New Orleans, to and including the Port of Baton Rouge, when the same are tendered to them at `Quarantine Anchorage' or the `point of general anchorage' at or near the lower limits of the Port of New Orleans, and/or when the same are tendered to them at wharves in the Harbor of New Orleans, and to accept and undertake the pilotage of vessels bound downstream from ports above the Port of New Orleans to wharves in the Harbor of New Orleans or to `Quarantine Anchorage' or at the `point of general anchorage' at or near the lower limits of the Port of New Orleans; and Crescent River Port Pilots Association, and the individual members thereof, have the legal obligation and duty to accept and undertake the pilotage of vessels bound upstream from Pilottown on the lower Mississippi River to wharves in the Harbor of New Orleans, or to `Quarantine Anchorage' or the `point of general anchorage' at or near the lower limits of the Port of New Orleans in the case of vessels bound for ports above the Port of New Orleans, and to accept and undertake the pilotage of vessels bound downstream below the Port of New Orleans *329 when the same are tendered to them at `Quarantine Anchorage' or the `point of general anchorage' at or near the lower limits of the Port of New Orleans, or from wharves in the Harbor of New Orleans.
"The Court is further of the opinion that the respective territorial jurisdiction of each of the said defendant pilot groups, is as follows, to-wit:
"(a) The territorial jurisdiction of the Crescent River Port Pilots Association, and the individual members thereof, is hereby declared to extend from Pilottown to the upper limits of the Port of New Orleans; within the Industrial Canal, between the Mississippi River and Lake Pontchartrain; within the Intracoastal Canal, between the Industrial Canal and the turning basin at Micheaud, inclusive; also for any other inland water route connected with the Port of New Orleans; and the Crescent River Port Pilots Association, and the individual members thereof, have the exclusive right of shifting vessels from wharf to wharf, anchorage to anchorage, and to and from wharves and anchorages within the Port of New Orleans.
"(b) The territorial jurisdiction of the New Orleans and Baton Rouge Steamship Pilots Association, and the individual members thereof, is hereby declared to extend from any point within the limits of the Port of New Orleans to and including the Port of Baton Rouge and intermediate ports, provided that the said New Orleans and Baton Rouge Steamship Pilots Association, and the individual members thereof, have no right to shift vessels from wharf to wharf, anchorage to anchorage, or to and from wharves and anchorages within the Port of New Orleans.
"For the foregoing reasons a permanent injunction will issue herein in accordance with the foregoing."
The district court judgment is affirmed, appellants to pay all costs of this appeal.
PONDER, J., dissents.
HAMITER, J., dissents, adhering to reasons assigned on original hearing.
NOTES
[1] Act 54 of 1908 contains the same provision. See section 7.