ÉLLÍS, Judge.
As a result of an audit by the Collector of Revenue of the defendant’s 1957 Corporation Franchise tax return, filed pursuant to LSA-R.S. 47:601 et seq., and after due notice of a proposed assessment of additional taxes of $6,291.00 together with interest thereon, and the payment by the defendant of an additional sum of $166.50 together with interest thereon and a refusal to pay the balance of $6,124.50 of the Collector’s original demand, the latter, on the 27th day of December, 1960 proceeded herein by summary process under the provisions of LSA-R.S. 47:1574, for judgment condemning the defendant to pay the additional sum allegedly due as Louisiana Corporation Franchise Taxes for its fiscal year ending March 31st, 1957.
The Collector contended in the District Court that the defendant failed to include in its taxable base for the year in question borrowed capital in the amount of $15,050,000.00, and the defendant denied that this amount represented borrowed capital as defined by the corporation franchise tax statute which is contained in that part of LSA-R.S. 47:603 which reads:
“As used in this Chapter, ‘borrowed capital’ means all indebtedness of a corporation, subject to the provisions of this Chapter,- maturing more than one year from the date incurred, or which is not paid within one year from the date incurred regardless of maturity date. As to any indebtedness which is extended, renewed, or re-financed, the date such indebtedness was originally incurred or contracted shall be considered for the purpose of this definition the date incurred or contracted.”
In his written reasons for judgment, the trial judge set forth the following facts in the case, to-wit:
“The $15,050,000 involved here consisted of loans made to defendant by some fifty-three banks in the United States. These loans were for a term of approximately 90 days. It is not contended that any one of the loans was renewed or extended to a date more than one year from the date it was originally contracted, except seven loans made by Whitney National Bank, New Orleans, aggregating $800,000, each of which remained unpaid for a period of more than one year. Defendant admits it owes corporation franchise tax on this amount for the year in question. In no other instance was the defendant indebted to any bank throughout the entire year. The evidence shows that with the exception of Whitney National Bank, each of the lending banks required defendant to be free of indebtedness to it for a period of thirty to ninety days each year.
“During the year in question defendant’s indebtedness for these short term bank loans ranged from a low of $15,050,000 to a high of $17,250,000. Plaintiff contends that except for the indebtedness of $800,000 to Whitney National Bank, the remainder of the $15,050,000 was refinanced, and hence not paid within one year from the date originally incurred, and was, therefore, borrowed capital as defined by the statute.
“The evidence shows that when a loan was paid at one bank a like amount was borrowed from another bank on or very near the same date. Of course, when the total indebtedness was being increased there was a borrowing from one bank without a concurrent payment to another, and when the total indebtedness was being decreased there was a payment to one bank without a concurrent borrowing from another. Defendant’s records show that in at least two instances a loan from one bank was used directly to pay a loan at another bank.
“The only dispute here is as to the definition of the word ‘refinanced’ as used in the statute.”
In addition to the above finding of fact, The District Judge in his written reasons reviewed the oral testimony of witnesses placed on the stand by the plaintiff and defendant and concluded that:
*265 “Considering the evidence, I am of the opinion refinancing has not been shown here, and that, under the time honored requirement of a preponderance of evidence, plaintiff has not proved his case except as to the $800,000 Whitney National Bank item. As to that item there is judgment for plaintiff as prayed for. Plaintiff's demands otherwise are rejected.”
Formal judgment was signed in accordance with the written reasons in favor of the plaintiff in the full sum of $326.00 together with interest at the rate of 6% per annum thereon from October 1, 1957, and 10% additional as attorney’s fees on both principal and interest, which sum was based upon the amount of “borrowed capital” obtained from the Whitney National Bank of New Orleans, Louisiana, which remained unpaid for a period of more than one year, and it is admitted by the defendant that this judgment is correct.
The plaintiff has appealed from the judgment of the Lower Court which rejected “all of the other demands of the plaintiff * $ *»
As agreed by both parties, this suit involves an interpretation of that portion of the Louisiana Corporation Franchise Tax law as contained in LSA-R.S. 47:603. As stated in the brief of counsel for plaintiff, an analysis of this section discloses that there are three types of indebtedness which are considered “borrowed capital”. They are as follows:
“1. All indebtedness with a maturity date of more than one year from the date incurred (Long-term debt).
“2. All indebtedness which is not paid within one year from the date incurred regardless of maturity date. If any indebtedness in this category is extended, renewed, or re-financed, the date such indebtedness was originally incurred must be considered the date incurred or contracted. (Short-term debt).
“3. Indebtedness to an affiliated corporation.”
We are concerned only with that portío» of LSA-R.S. 47:603, “borrowed capital” as. contained in Type 2, above.
In addition to the facts which we have' taken the liberty of quoting from the written reasons of the esteemed judge below, it is shown that the defendant company is a Delaware corporation authorized to do and doing business in the State of Louisiana and is engaged in the general finance business which consists principally of discounting installment notes receivable which are secured by chattel mortgages, generally on automobiles, which are purchased from automobile dealers who have acquired the notes in connection with the sales of automobiles. It also acquires installment notes in making direct loans to owners of automobiles and other chattels and in refinancing contracts on a discount basis, and advances financing to automobile dealers on their short term notes, secured by liens on their inventories of motor vehicles, which are known as “Wholesale” or “Floor Plan” notes. In addition, it holds a license under the Louisiana Small Loans Law and makes interest bearing loans in sums less than $300.00. During 1957 it maintained a home office in Houston, Texas, and ten branch offices in the states of Texas, Louisiana, Georgia and Florida. During the period in question defendant dealt with a total of Fifty-three banks, from which it borrowed substantial sums of money. The $14,250,000 which the plaintiff contends is “borrowed capital” was borrowed from various banks on undisputed genuine short term loans. It is undisputed that the company was financially sound and for brevity we quote on this point from brief of counsel for defendant, to-wit:
“On March 31, 1956, Mossier Acceptance Company had capital stock and surplus totaling $5,845,377.66 and borrowed funds (exclusive of the short term bank loans involved in this litigation) amounting to $6,390,000.00. Its franchise tax base included all of these funds, a total of $12,235,337.66. Similarly, on March 31, 1957, Mossier Ac *266 ceptance Company had capital funds of $6,135,574.87 and borrowed funds (exclusive of short term bank loans) of $4,980,000.00. It paid franchise tax computed on this total base, $11,-115,574.87. For the year ended March 31, 1957, Mossier Acceptance Company paid the State of Louisiana a corporation franchise tax amounting to $4,531.-50.”
According to the record the banks require finance companies, which included the defendant, to make loans on a ninety day basis with the right reserved to require payment at the end of any ninety day period. As explained by Mr. Lewis Gottlieb, previous president of the City National Bank and at the time of trial Chairman of the Board of this bank, which is located in the City of Baton Rouge, when money was cheap and plentiful the bank was anxious that the finance companies not pay at any time during the year, but that as money began to get tight they required the companies to pay sometime during the year, however, during the years 1956 and 1957, which is concerned in the case at bar, the defendant company was required to pay off at sometime during the year and it was usually about ninety days before it could come back and borrow again. This witness further testified, which was generally true that all banks that loaned money to the defendant company, that if they agreed to lend $100,-000.00 to the defendant company it was required to keep “compensating balances of fifteen or twenty per cent. If we require the company to be out of our debt for 90 days, then we can take care of more customers and consequently have more deposits and make more money than we can by merely taking care of one company continuously.” This was done in connection with the loans to the defendant company by the City National Bank of Baton Rouge, that is, requiring a compensating balance as well as a resting period. The effect of this policy by the banks resulted in an actual output or loan of $85,000.00 on $100,000.00 borrowed as it carried with it the requirement for a compensating balance of $15,-000.00 which, by the way, was required to be carried the entire year even though the rest period as shown by the record was from thirty to ninety days, depending upon the individual bank. This, of course, was not true of the Whitney National Bank of New Orleans and the judgment was granted on that amount and is not disputed. As summed up by Mr. Gottlieb in his testimony, the arrangement of the banks with the Finance companies results in, “It raises the interest rate and also gives us additional deposits that we can lend out. We like them to that extent.” It was frankly admitted by Mr. Hayden Ellis, the reviewing auditor, Field Audit Division, of the Department of Revenue, who had been with the Department thirteen years, that the method of doing business required by the banks on ninety day short term loans, with one or two renewals, payment within less than one year, and reborrowing at another bank of the same amount at or near the date of payment of the original note, was not a part of a scheme or plan by the defendant to evade or avoid franchise tax. However, the plaintiff contends that this method of business operation brings this indebtedness within the definition of “Borrowed capital” for Louisiana Corporation Franchise tax purposes, which exists for more than one year by virtue of its being a short term debt which was re-financed and not paid within one year from the date incurred. This contention is included in the plaintiff’s brief under heading III, while the only other heading with which we are concerned is set forth under IV and we quote both headings:
III.
“ ‘Borrowed Capital’ for Louisiana Corporation Franchise Tax purposes includes all indebtedness of a corporation which exists for more than one year, whether it is debt with a term of more than one year or short term debt which is extended, renewed, or re-financed. La.R.S. 47:603.”
*267 IV.
“A corporation is re-financing an indebtedness within the meaning of R.S. 47:603 when it borrows money on 90 day bank notes, renews them twice and then borrows money from other banks on new notes at the time the old notes are paid. La.R.S. 47:603. Louisiana Corporation Franchise Tax Regulations Article 603-1.”
As opposed to the above contentions, the defendant in the syllabus of his brief sets forth its contentions, to-wit:
"I. The Louisiana Corporation Franchise Tax is imposed only on Capital Stock, Surplus, Undivided Profits and Borrowed Capital as defined in the statute. It does not seek to tax all corporate indebtedness.
“II. Mossier Acceptance Company did not extend or renew any of the bank loans involved in this case so as to bring them within the meaning of the term ‘Borrowed Capital.’
“III. Borrowing money for ninety days from one bank, to provide part of the operating funds of a company, or even to pay indebtedness due another bank, is not ‘Refinancing’ as that term is employed in the Louisiana Corporation Franchise Tax Law. State v. Banana Selling Company, 170 So. 30, 185 La. 668 [107 A.L.R. 1298] (1936). State v. Xeter Realty, Ltd., 182 La. 414, 162 So. 29 (1935).
“IV. For ten years after its enactment in its present form the Corporation Franchise Tax was interpreted by the Collector and by taxpayers not to impose a tax on short term bank loans, and the Legislature never sought to change the law. This contemporaneous construction indicates the true meaning of the term ‘Refinanced’ as that word is used in the Corporation Franchise Tax Law. 50 American Jurisprudence ‘Statutes,’ § 318, p. 307. Delta Life Ins. Co. v. Martin, 59 So.2d 465 (1st Cir., 1952). Esso Standard Oil Co. v. Crescent River Port P[ilots] Assn., 235 La. 937, 106 So.2d 316 (1958), Porea v. Moses, 35 So.2d 152 (Orleans App.1948). Preliminary Report of the Louisiana Revenue Code Commission. State ex rel Fitzpatrick v. Grace, 187 La. 1028, 175 So. 656 (1936).
“V. The so-called regulation which seeks to revise the language of Louisiana R.S. 47 603 is invalid. Carso v. Board of Liquidation, 205 La. 368, 17 So.2d 358 (1944). Louisiana Constitution of 1921, R.S. 47 1511, State v. Maitrejean, 192 So. 361, 193 La. 824 (1940). United Gas Corporation v. Fontenot, 241 La. 564, 129 So.2d 776, 779.
“VI. The terms of a tax statute are not to be extended beyond their fair meaning in an effort to reach transactions which might have been taxed by the Legislature but which the Legislature did not in fact tax. Tax laws are to be liberally interpreted in favor of the taxpayer and strictly construed against the taxing authority. Any doubt or ambiguity is to be resolved in favor of the taxpayer. Higgins, Inc. v. Walker, 129 So.2d 840 (1st Cir. 1961). State v. Standard Oil Company of Louisiana, 188 La. 978, 178 So. 601, 605 (1937). United Gas Corporation v. Fontenot, 241 La. 564, 129 So.2d 776, 781.
“VII. If the interpretation of the statute advanced by the collector is applied to the taxpayer, the statute will be unconstitutional. Dantoni v. Board of Levee Commissioners of Orleans, 227 La. 575, 80 So.2d 81 (1955). In re Interstate Trust & Bank Co., 204 La. 323, 15 So.2d 369 (1943). Standard Oil Co. of La. v. Police Jury of Red River Parish, 140 La. 42, 77 [72] So. 802 (1916). State v. Chesesi [Chisesi], 187 La. 675, 175 So. 453 (1937), State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949). State v. Wilson & Company, 154 So. 636, 179 La. 648, (1934). Tanner v. Beverly Country Club, 217 La. 1043, 47 So.2d 905 (1950). Williams v. Department of Highways, 92 So.2d 98 (1st Cir. 1957).”
There is no question, nor is it made an issue, of the soundness of the defendant’s first contention, supra. The same is true of *268 defendant’s second contention, for we are not concerned with an extension or renewal of any of the bank loans involved in this case, but only a contention by the plaintiff that they were “re-financed”. .
We will first consider the plaintiff’s contention No. IV as we are of the opinion that it is completely dependent upon the correctness of their contention No. III. In order to fully understand this contention we quote the pertinent portion of plaintiffs brief pertaining thereto, to-wit:
“The Collector contends that R.S. 47:603 makes such debt borrowed capital with the phrase ‘as to any indebtedness which is extended renewed or re-financed.’ In this situation there is present one or two renewals and then a re-financing. If the language of R.S. 47:603 left any doubt as to whether such an arrangement produces taxable borrowed capital, this doubt was removed by the regulations issued by the Collector of Revenue pursuant to the power granted him in R.S. 47:1511. The Louisiana Corporation Franchise Tax Regulations, Article 603-1 provides in part:
jJ:
“ ‘2. Indebtedness more than one year old as of close of fiscal or calendar year.
“ ‘This classification depends upon the age of the overall indebtedness of the corporation and is not necessarily limited by the age or maturity date of specific obligations owed by the taxpayer. Any single obligation which is more than one year old falls into this category. Also included as borrowed capital is the minimum level or overall indebtedness which has existed for more than one year which results from the extension, renewal or refinancing of existing indebtedness whether such indebtedness is evidenced by commercial paper or is merely carried as open accounts.
“ ‘The primary test of refinancing shall be whether or not the taxpayer uses a system or plan for the obtaining of capital or funds for the operation of his business under which he maintains a level of indebtedness for over one year through a series of credit transactions. Under this test of refinancing it is not necessary that the old and new obligations be for the same amount, or that the same collateral or security be used. It is not necessary that the obligation of indebtedness be owed to the same creditor or that the new obligation be incurred on the same date that the old obligation is discharged.
“ ‘It shall suffice that the taxpayer have a systemized method or plan for the obtaining of capital and funds and that he in fact maintain a level of indebtedness for more than one year under such system or plan. Only that level of indebtedness existing for more than one year shall be included as borrowed capital. In all cases this amount will be the lowest level of indebtedness reached during the fiscal or calendar year.’ ”
There is no law nor jurisprudence cited in support of the contention that the right or power to make such a regulation was granted to the plaintiff under the statute, nor any jurisprudence upholding the legality of the regulation in question.
In order not to unnecessarily lengthen this opinion, and being in accord with the arguments advanced and the authorities cited by the defendant in its brief, which make it obvious or clear that the plaintiff was not granted the power or authority under the Statute of promulgating, making and publishing the regulation in question so that it would “have the full force and effect of law,” we therefore quote the pertinent portion of defendant’s brief in support of such a conclusion, to-wit:
“The entire Louisiana. Corporate-Franchise Tax Law as amended, is contained in Revised Statutes, Title 47, Chapter 5. Nothing contained in that chapter delegates to the Collector of Revenue any authority to promulgate regulations defining the terms used in the Statute. The only authority given the Collector of Revenue which might possibly apply to the franchise tax is con *269 tained in R.S. 47:1511. This section in the Revised Statutes of 1950 reads as follows:
“ ‘In addition to specific authority granted to the collector else where in this Sub-title, the collector is authorized to promulgate, make and publish reasonable rules and regulations for the purpose of the proper administration and enforcement of the provisions of each Chapter in this Sub-title, and the collection of revenues thereunder; provided that such rules and regulations shall not be inconsistent with the provisions of this Sub-title or other laws or the constitution of this state; and provided further that such rules an regulations shall have the full force and effect of law.’[65]
“As an examination of the text of this section indicates, authority is not given the Collector to establish rules and regulations to interpret the terms of the tax statute or to modify any of the provisions adopted by the legislature. The sole authority given the Collector is to promulgate ‘reasonable rules and regulations for the purpose of the proper administration and enforcement of the provisions of each Chapter in this Subtitle.

“Obviously, the so-called ‘Regulation’ sought to be adopted by the Collector in 1957 went far beyond administration and enforcement of the provisions of the chapter and constituted an effort to redefine the statutory lagnuage not as the legislature adopted it, but as the Collector would like to have it.
“The Louisiana Supreme Court recently dealt with a similar effort to define a provision of the Franchise Tax Statute in United Gas Corporation v. Fontenot, 241 La. 564, 129 So.2d 776, 779. The Court said:
“ ‘In such instructions it is stated that stocks and bonds should be allocated within and without Louisiana on the basis of the commercial domicile of the taxpayer, and likewise that dividends (other than those of subsidiaries and affiliates) should be allocated to the state in which the commercial domicile is maintained. They also require that interest should be allocated on the same basis as the investments which produce the income. However, the instructions thus invoked and relied on evidence nothing more than the collector’s cofir-struction of the statute. And they are not pertinent herein in anywise, unless it can be said that they provide a correct application of the statutory provisions (LRS 47:606) in question.’ (Emphasis added.)
“It is therefore clear that the legislature has not delegated authority to the Collector to adopt the so-called ‘Regulation’ and that this attempt by the Collector himself to revise the Corporate Franchise Tax Law is invalid.”
Bearing in mind that tax laws are to be liberally interpreted in favor of the tax payer and strictly construed against the taxing authority and that any doubt or ambiguity is to be resolved in favor of the tax payer, and the authorities cited in support thereof (see Syllabus VI of defendant’s brief, supra), we will proceed to a consideration of the real issue in this case, viz., whether the indebtedness herein had been re-financed under the facts found by the District Court and further discussed by this Court.
In order to determine whether the indebtedness had been re-financed plaintiff offered the testimony of Mr. Hayden Ellis, Reviewing Auditor, Field Auditing Division, Department of Revenue, by whom he had been employed for thirteen years, and Dr. Stephen L. McDonald, an admitted expert, Professor and Head of the Department of Economics at Louisiana State University for approximately five months previous to the date of the trial and who before that time had been the head of the Department of Finance at L.S.U. and before that, Associate Professor of Finance at L.S.U. and *270 also head of the Department, and before that an economist for the Humble Oil and Refining Company, and before that an Assistant Professor of Economics at the University of Texas, and he held a Bachelor of Arts from Louisiana Tech, master of arts and Ph.D. from the University of Texas and had primarily taught courses in the area of money and banking
The defendant placed on the stand Mr. Lewis Gottlieb, a banker, former president of the City National Bank of Baton Rouge and its present Chairman of the Board, Mr. Walter J. Fountain, a graduate of Tulane University with a B.D.A. degree and a C.P. A. degree in three states, Mississippi, Texas and Louisiana, and who was employed at the time of the trial as president and treasurer of Mossier Acceptance Company, the defendant, who had also been almost continuously engaged in the finance business since 1932, Mr. Frank C. Guthrie, a banker, who was connected with the First City National Bank in Houston since 1948 and on the date of the trial was serving in the capacity of senior vice-president, Mr. George H. Giraud, Jr., a Certified Public Accountant practicing in Louisiana and Texas, and Dr. Stanley W. Preston, Professor of Finance at Louisiana State University since 1934.
The Judge of the Lower Court in his written reasons briefly and concisely summed up the testimony of the plaintiff’s and defendant’s witnesses, except the two experts, Dr. Preston, who testified for the defendant, and Dr. McDonald who testified for the plaintiff, as follows:
“The only dispute here is as to the definition of the word ‘refinanced’ as used in the statute.
“In addition to the documentary evidence the court heard the oral testimony of several witnesses. Hayden Ellis, reviewing auditor for the department of revenue, was, of course, of the opinion that the loans in question were refinanced. Walter J. Fountain, president of the defendant corporation, was, of course, of the opinion they were not. Lewis Gottlieb, chairman of the board of City National Bank, Baton Rouge, one of the lending banks; Frank C. Guthrie, senior vice-president of First City National Bank, Houston, another of the lending banks; and George H. Giraud, Jr., defendant’s certified public accountant, each expressed the opinion that the borrowing operations here involved did not include any element of refinancing.”
Dr. Preston, testifying on behalf of the defendant, defined borrowed capital in the corporate finance sense as referring to capital which the corporation had acquired through the issuance of securities with a maturity date in excess of one year from the date of issuance, and he doubted that the term “Capital” or “Borrowed Capital”, as those terms are understood in the field of corporation finance, would include bank loans made for a term of less than one year. He further testified that in the field of corporation finance in determining whether given funds were considered “Borrowed Capital” he would look to the age of the specific items comprising the borrowed capital fund rather than a minimum level of indebtedness. He stated that the term “refinanced” was not too often defined specifically but was defined in several works and “ordinarily refers to the sale of securities for the purposes of paying off other obligations.” He testified positively that in the field of corporation finance he had not seen any instance of the term “refinancing” being used to include the paying off of one short term loan with the proceeds of another short term loan, in the works with which he was familiar, but he did find that paying off a current liability with a long term loan was quite frequent, and that in the latter case it could come under the heading of refinancing. Dr. Preston testified that he had examined a preliminary report of the Louisiana Revenue Code Commission made in 1946 which resulted in the enactment of the present provisions as to borrowed capital in the Louisiana Franchise Tax law and that the definitions and motives advanced in *271 that report were consistent with the definitions and explanations in the field of corporate finance of borrowed capital and refinancing, as he understood those terms, which we understand from his testimony to be that borrowed capital in the corporate finance sense refers to capital which the corporation acquired through the issuance of securities with a maturity date in excess of one year from the date of issuance.
On cross examination Dr. Preston was questioned as to the meaning of the word “funding” and stated that it ordinarily was used to refer to an act where a temporary loan is replaced with a long term loan and that “refunding” was the replacement of a long term loan with another long term loan. He also defined a short term loan as one which would be for a term less than one year. He stated that “refunding” could very well be and usually was classified as a type of refinancing, and would include the substitution of one security for another but in such cases he stated “One bond is coming up for maturity, the company issues another bond, the proceeds of which are used to pay off the first, long term obligations, both of them.” He disagreed with a book dated 1933, Hoagland Corporation Finance, which stated, “Cost of financing and particularly of refinancing, if that be necessary, by means of additional short term notes is generally quite high,” and as his reason for disagreeing testified that you could not finance with a short term note “in the usual sense and in modern times.” He then read a definition of refinancing from a modern text, Guthmann and Dougall, on Corporate Financial Policy which stated: “Refinancing involves the sale of securities to retire existing obligations.” He gave the page citation as 613, and testified that it was one of the standard works currently accepted.
Dr. McDonald, testifying on behalf of the plaintiff in rebuttal was of the opinion and so stated under direct examination that the word “refinancing” could be applied to a situation where short term notes were being replaced by short term notes. He stated, “This seems to me a reasonable construction.” Dr. McDonald was asked the following specific questions and gave the following answers:
“Q. Doctor, where we have a situation in which a corporation maintains a high level of indebtedness on short term loans, notes, throughout a period of several years, they may borrow one day and pay off the note the next without being able to trace the funds from one bank to the other, from the borrowing bank to the bank that, from the bank they borrow from to the bank they pay to, would you say that this is a scheme which could be defined as refinancing?
“A. This involves paying off one bank one day with funds, you don’t know where these funds come from, but at the same time simultaneously you are borrowing from another bank?
“Q. Yes, sir.
“A. I think this is a reasonable, could reasonably be included in the definition of refinancing.
“Q. In your opinion is that refinancing?
“A. Every kind of financial operation is different. Let me see if I can answer it in this way, refinancing does have, although it is a general term, a rather specific meaning. It means the substitution of one form of debt or evidence of equity for another. If we think of this as a continuous type of operation on the part of the business, what they are doing is continuously substituting one type of note, or one note for another, in order to have continuously the funds with which they operate. This being the case, it seems to me it comes within the definition of refinancing.”
On cross examination Dr. McDonald frankly admitted that the above testimony was not fully correct reading the definition of borrowed capital as stated in our law, supra. He was asked on cross examination the following questions:
“Q. Well, suppose Mossier Acceptance Company, which then owed no short term *272 bank loans, went down to the bank and borrowed $500,000 on a 90 day note and paid that note at the end of 90 days, would that be borrowed capital as — ■
“A. Yes.
“Q. —you understand the term? Now have you looked at the Louisiana corporation franchise tax law to see if that law employs the term in the sense in which you understand it ?
“A. I have not.
“Q. I would like to show you the section of the corporation franchise tax law and ask you to read the definition of borrowed capital as stated in the law.
“A. (The witness reads the section referred to.) According to this definition the last case you gave me would not be included in borrowed capital.”
Dr. McDonald, after reading the law again, testified that the term “refinancing” as used in the law has reference to the definition of borrowed capital as contained in the law, and that “refinancing” is not defined in the law. He also testified that the terms “extension”, “renewal”, and “refinancing” as used in the statute did not refer to an average level of indebtedness or a minimum balance of indebtedness because “ * * * all three of these terms refer to acts rather than facts of levels or amounts.”
Under cross examination Dr. McDonald testified additionally as follows:
“Q. Now suppose — I want to give you a hypothetical question which I think is borne out by the evidence before the Court, but we will put it in hypothetical form. It is quite close to the question which you were asked previously but I think a little different. Suppose you have a company engaged in the business of borrowing and lending money, that is, a finance company; suppose it has on hand cash in the amount of approximately $4,000,000; it has notes receivable in the amount of $28,000,000 and other assets of relatively small value; it has notes payable, all from maturity dates of 90 days, approximately in the amount of $17,000,000; and it has a long term debt and net worth funds in the amount of approximately $10,-000,000; from time to time these individual notes which comprise the $17,000,000 fund fall due and when they fall due the corporation which owed the note draws a check or transfers funds by wire from its corporate treasury account or from other bank accounts to pay the notes which are due; from time to time it likewise borrows money from other banks; at all times its cash on hand is equal to or in excess of the amount of then maturing short term notes, based upon your understanding of the word ‘refinancing’ as it is used in the section of the law in front of you, would you say that that company is engaged in refinancing short term notes?
“A. I couldn’t tell from the information that you gave me.
“Q. What additional information would you like to have ?
“A. I would need to know what happened to the cash account and/or to the notes account at the time that this, the notes were paid off and the checks were drawn that you mentioned. In other words, if there was no change in those, then it would be pretty obvious what the firm was doing was simply replacing one debt with another.
“Q. I show you, in an effort to provide the additional information which you would need to answer that question, the exhibit D-3, showing the available cash which this company had at any month during the fiscal year involved — ■
“MR. BATSON: Mr. Rubin, I believe all of these notes Mr. Fountain testified were paid out of the Bank of the Southwest in Houston. Perhaps we should show him that cash account rather than the total cash in the company.
“MR. RUBIN: I’m going to show him all of these.
*273 “Q. I show you exhibit D-4, showing the cash inflow of the company- — (At this time Court recessed for a short time and thereafter reconvened).
“Q. We have had a short recess and I will not restate the lengthy question which was asked iitimediately prior to the recess, hut I think you recall it and have done some work in connection with it during the recess.
“A. Yes.
“Q. Would you state the conclusion that you have reached to the Court ?
“A. My conclusion is that during a particular month, and I have checked it for a year as a whole, since the reduction in bank debt was not offset by either a reduction in the cash balance, then the reduction, the reduction in bank debt, must have been refinanced.
“Q. Now you have therefore reached the conclusion in the hypothetical situation that there was some refinancing?
“A. Yes, there was.
“Q. Would you say that was a refinancing of borrowed capital or refinancing of short term debt ?
“A. Well, I don’t exclude short term debt from my definition of borrowed capital.
“Q. But the statute which you have before you only seeks to tax borrowed capital, is that correct?
“A. I beg your pardon.
“Q. The statute seeks to tax only borrowed capital as defined in the statute?
“A. Yes.
“Q. Now, you defined ‘refinance’, and I’m asking you whether you are now defining it in terms as used in the statute, that is, in terms of a refinancing to achieve a borrowed capital status that is capital due for more than one year.
“A. I couldn’t tell, of course, if this is a 90 day note replaced with another 90 day note, and of course we are going to need some more 90 day notes in sequence before we ever reach the year as classified by the statute, so I couldn’t tell from this whether or not this act would qualify this amount as borrowed capital under the definition. All I’m saying is that what seems to have happened here is that refinancing has occurred. Now whether the whole term is going to amount to more than a year, I couldn’t say.”
Apparently from Dr. McDonald’s last answer above and which was given after a thorough examination of all exhibits in the case which counsel thought necessary for the witness to answer the question of whether refinancing had taken place as defined by the statute, he could not testify positively that “the whole term is going to amount to more than a year, I couldn’t say.” We were impressed by the testimony of Dr. McDonald that where there is no change in the cash account arid/or the notes account at the time the short term notes were paid that “it would be pretty obvious what the firm was doing was simply replacing one debt with another,” and with his conclusion after examining the necessary exhibits and having checked the exhibits for a year as a whole “that during a particular month, * * since the reduction in bank debt was not offset by either a reduction in the cash balance, then the reduction, the reduction in bank debt, must have been refinanced.” However, it is to be noted that this is based only upon a conclusion as shown by the exhibit for a particular month and his final testimony was that he could not tell from the exhibits whether the ninety day notes were replaced with other ninety day notes and whether the transaction was for as long as one year, “ * * * so I couldn’t tell from this whether or not this act would qualify this amount as borrowed capital under the definition. * * * ” He frankly stated that it seemed that refinancing had occurred but whether the whole term was going to amount to more than a year it was impossible for him to say.
Therefore, considering the exhibits and the testimony in this record there was no *274 obvious or manifest error in the opinion of the Trial Judge that “refinancing has not been shown here, and that, under the time honored requirement of a preponderance of evidence, plaintiff has not proved his case except as to the $800,000 Whitney National Bank item,” we, therefore, agree with the judgment of the trial court and it is hereby affirmed.
Affirmed.

. By Act 168 of 195S the section was amended with regard to the method of promulgating regulations. However, the amendment does not relate to the period of time covered by this suit.