WATSON, Judge.
This is a proceeding brought by Joseph N. Traigle, Collector of Revenue, State of *860 Louisiana, against P.P.G. Industries, Inc., an industrial chemical manufacturing concern, for sales and/or use taxes alleged to be due. The controversy concerns blades of graphite used in the production of chlorine at the Calcasieu Parish plant of P.P.G. The Collector contends taxes are due on the graphite, but P.P.G. contends that the material is further processed into tangible personal property for sale at retail and thus is exempt under applicable statutes, to be reviewed hereafter. Following a decision by the trial court in favor of the Collector, P.P.G. has appealed.
In order to consider the issues involved, it is necessary to review the process by which chlorine is produced and to consider the role of graphite in the process. This has been succinctly stated by the trial court in its reasons for judgment and we will quote:
“The process, for our purposes, is fairly simple. Electrical current is applied to a salt water brine solution inside a Columbia chlorine cell. The application of the current through this salt water solution breaks the salt water down into chlorine, hydrogen, and caustic soda, all salable products of the process. The cathode used in this process is a perforated sealed screen covered with asbestos diaphgram. The anodes are graphite blades imbedded in lead. The continuous exposure of these graphite anodes to the electrical bombardment eventually chemically consumes most of the blades down to a point where it becomes economically unprofitable to continue to use them, and they are replaced with fresh blades.
“Graphite is carbon. In the process of chemical breakdown of these graphite blades, carbon atoms combine with oxygen atoms (from the breakdown of the water in the brine) to form carbon dioxide (CO2) and carbon monoxide (CO). These oxides of carbon get into the product stream and are found with the final chlorine product. The PPG chemist testifying at the trial estimated that the final chlorine product contains from 1%% to 2% by volume oxides of carbon.” (TR. 237-238)
We would add that the record also indicates without contradiction that approximately 60% of the graphite is consumed and appears in the chlorine product stream. This is a constant process and the chlorine cells are monitored carefully to determine when the graphite has been consumed to the point where the cell must be dismantled and new blades of graphite installed.
Only three witnesses testified at the trial of this matter. One was a representative of the Collector whose testimony is not pertinent to the present issue.
Thomas C. Jeffery, chief processing engineer of P.P.G., who qualified as an expert in chemistry with special expertise in chlorine production, described in detail the chlorine production process, and identified pictures of the graphite itself as well as the various stages of the manufacturing procedure. Mr. Jeffery, from his testimony, is obviously well-qualified and intimately familiar with chlorine production, both in theory and in practice.
Testifying for the Collector was Dr. Hu-len B. Williams, Dean of the College of Physics and Chemistry at L.S.U. Dr. Williams possesses outstanding qualifications in the field of chemistry, although he lacks practical experience in the industrial production of chlorine.
There was almost no conflict in the information supplied by the two experts in the field of chemistry. The trial court’s description of the consumption of the graphite and the manufacturing process is drawn largely from Jeffery’s description.

Statutory Provisions

Both parties to the litigation recognize that under the Louisiana Sales Tax Law, LSA-R.S. 47-301 et seq., P.P.G. would owe tax on the graphite unless it falls within the exclusion described by the sec *861 ond paragraph of LSA-R.S. 47:301(10), which in pertinent part reads as follows:
“The term ‘sale at retail’ does not include sales of materials for further processing into articles of tangible personal property for sale at retail, . . . ”
The issue is therefore whether the graphite is further processed into tangible personal property for sale at retail. It appears undisputed that the end result of the chlorine production, that which is described as the chlorine stream, is sold at retail or otherwise accounted for.
Thus, the issue, narrowly stated, is whether the graphite is processed into tangible personal property.
Acting under LSA-R.S. 47:1511, the Collector adopted certain rules and regulations which were in effect during the taxable period involved. The regulation which the Collector contends is applicable to the present dispute is as follows:
“Article 2-37. Sales to manufacturers and producers. — ■
The gross receipts or gross proceeds derived from sales of raw materials to manufacturers and producers to he used in fabricating or producing finished articles of tangible personal property for resale, and which becomes a recognizable, integral part of such finished articles, are not subject to the tax imposed under the Sales Tax Act. The proceeds derived from subsequent sales of such finished articles of tangible personal property to consumers or users, are subject to the tax.”
The parties differ as to the application of the quoted regulation. The Collector contends that the regulation is a proper and lawful exercise of his authority and, under its wording, the taxpayer owes tax on the graphite. The taxpayer contends that the quoted regulation is an unauthorized and unlawful extension of the Collector’s authority, because it does not deal with administration or enforcement of the tax law but merely states the Collector’s definition or interpretation of a term in the tax statute. The taxpayer thus contends that the regulation- is invalid, citing several cases, but particularly Collector of Revenue v. Mossler Acceptance Co., 139 So.2d 263 (La.App. 1 Cir. 1962) certiorari denied; and United Gas Corporation v. Fontenot, 241 La. 564, 129 So.2d 776 (1961).
We find that the graphite, which has been chemically changed into CO and CO2, falls within the definition of LSA-R.S. 47:301(10) and the regulation adopted by the Collector. Therefore, we find it unnecessary to decide whether the Collector’s regulation is an illegal extension of his authority.
The testimony of the expert witnesses convinces us that the CO and CO2 are recognizable in the produced chlorine stream since it was established that these substances constitute approximately one and one-half to two per cent of the finished product. We are further convinced that the CO and CO2 are integral portions of the product stream since the Collector’s expert, Dr. Williams, testified that in his opinion there was no economical way to take these substances out of the product stream.
Our esteemed brother of the trial court erred, in our opinion, when he made a legal conclusion that:
“Implicit in the statutory definition[1] . . . is the reasonable interpretation *862 that such material must be of some benefit to the end product.” (TR. 242).
After reviewing the record, and considering the statutes, the meager jurisprudence and the arguments of counsel, as well as evaluating the objects to be promoted by the sales or use tax, we have concluded that the graphite should be held exempt from taxation. In viewing the use and consumption of the graphite under the statute, there are two important points and these are: (1) the graphite blades are consumed; and (2) they appear (or at least 60% of the graphite carbon does) in the final product stream. As noted above, the beneficial issue is not relevant and the emphasis placed on this feature, in our opinion, is in effect begging the question by setting up an irrelevant test. The statute itself requires: (1) further processing, as in the consumption of the graphite blades; into (2) articles of tangible personal property, which equates with the appearance of the graphite carbon (or the major portion thereof) in the final product stream.
The trial court noted that the graphite carbons did not form a part of the chlorine which is correct. However, it is not only the chlorine which is sold by P.P.G.; it is the final product stream which includes not only chlorine but traces of other chemicals and 1% to 2% by volume oxides of carbon. Presumably, and the record suggests nothing to the contrary, the purchaser from P. P.G. pays for the entire volume or weight of the material purchased and the tax is collected accordingly. There is no indication of a discount because the chlorine contains a small percentage of oxides of carbon.
The issue considered has been treated by the jurisprudence in only one case to which we have been cited and that is L.A. Frey & Sons v. Lafayette Parish School Board, 262 So.2d 132 (La.App. 3 Cir. 1972). In Frey, this court considered an issue which is almost squarely in point to our present question. In Frey, a meat processor used sawdust to smoke some of its meat products. This court found as follows on that issue:
“Frey purchases sawdust which it burns for smoke to cure meat products. Section 1.15 provides that the tax does not-apply to ‘sales of materials for further processing into articles of tangible personal property for sale at retail.’ Frey contends the purchase of the sawdust is exempt since the term ‘processing’ includes not only materials which are incorporated into the final meat product, but also those which are used to cure or flavor the meat, such as salt, pepper, etc. We think the trial judge correctly ruled that the sawdust was used for the processing of meat and is therefore exempt.” 262 So.2d 137.
Counsel for the Collector suggests that this court gave only brief consideration to “the sawdust issue”. While the treatment was brief, we believe that it was correct and the same rationale applies to the graphite. In fact, the chemically recognizable oxides of carbon in the final chlorine stream would seem to fit the statutory description of “tangible personal property” more strongly than the mere smoked flavor or smell imparted to the meat by the burning of sawdust. Under Frey the sawdust was held exempt and by analogy, we conclude that the graphite is exempt.
Therefore, the judgment of the trial court is reversed and plaintiff’s petition is dismissed; costs insofar as allowed by law are taxed against plaintiff.
Reversed.
FRUGÉ, J., respectfully dissents with written reasons.

. The trial court here referred to another regulation of the Collector adopted subsequent to the taxable period at issue which leveled the requirement that the material be of benefit. This was error, since the regulation published by the Collector subsequent to the taxable period at issue can have no possible effect on the inquiry. If the courts were to recognize such regulations published after the fact, and allow them to have any bearing on the decision of a controversy, it would be possible for the Collector to publish such regulations as he desired to fit problems which had developed or cases which were pending in court.